**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0627
Celeste Alexandria Owens
v.
The State

On Appeal from the Superior Court of Chatham County
No. 24B0359011

Decided: June 30, 2026

MCMILLIAN, Justice.

Appellant Celeste Alexandria Owens was convicted of malice murder and related crimes for the death of Amari Nicole Hall, who was the eight-year-old daughter of Owens's girlfriend and co-indictee Brittany Hall, as well as several additional counts of cruelty to children in the first degree related to separate abuse of all three of Hall's minor children.[1]  On appeal, Owens argues that

---

[1] Amari died in November 2021.  On September 25, 2024, a Gwinnett County grand jury indicted Owens and Hall, individually and as parties to the crimes, for malice murder (Count 1), felony murder predicated on cruelty to children in the first degree (Count 2), felony murder predicated on aggravated battery (Count 3), felony murder predicated on aggravated assault (Count 4), cruelty to children in the first degree (Count 5), aggravated battery (Count 6), aggravated assault (Count 7), 11 additional counts of cruelty to children in the first degree related to abuse of Hall's three children on separate occasions (Counts 8–18), and concealing the death of another (Count 19); Owens was also charged individually for making a false statement (Count 21).  Owens was tried separately from Hall, who later pleaded guilty to felony murder and multiple other counts and was sentenced to life in prison; Hall's case is not part of this

the evidence was insufficient to support her convictions. For the reasons that follow, we affirm.

1. The evidence presented at trial showed that Owens and Hall were in a dating relationship since at least 2013 when Amari was born, and during that relationship, Hall gave birth to two other children. In November 2021, the family was living in an extended stay hotel in Gwinnett County.

Shortly after 9:00 a.m. on the morning of November 21, 2021, Hall called 911 and reported that Amari was missing. Police officers responded and spoke to Hall and Owens in their hotel room while the two younger children slept. Hall said that she last saw Amari around midnight when Hall went to bed, but when she

---

appeal. At a trial held in December 2024, the jury found Owens guilty of all counts. The trial court sentenced Owens to serve life in prison without the possibility of parole for malice murder (Count 1), consecutive 20-year terms to serve in prison for the child-cruelty convictions that did not serve as the predicate to felony murder (Counts 8–18), a consecutive 10-year term to serve for concealing the death of another (Count 19), and a five-year consecutive term to serve for making a false statement (Count 21). The trial court merged the child-cruelty conviction (Count 5) into the felony murder predicated thereon (Count 2), aggravated battery (Count 6) into the felony murder predicated thereon (Count 3), and aggravated assault (Count 7) into the felony murder predicated thereon (Count 4), and the three felony murder counts were vacated by operation of law. We note that it was error to merge the predicate felonies into their respective felony murder counts rather than, where appropriate, into the malice murder conviction, see *Williams v. State*, 313 Ga. 325, 332 (2022); *Tesfaye v. State*, 275 Ga. 439, 442 (2002), but because any error benefits Owens and the State has not raised it on cross-appeal, we decline to exercise our discretion to correct any error under *Dixon v. State*, 302 Ga. 691, 698–99 (2017).

Owens filed a timely motion for new trial, which was amended by new counsel. Following a hearing, the trial court denied Owens's motion for new trial, as amended, on November 17, 2025. Owens filed a timely notice of appeal, and the case was docketed to the April 2026 term of this Court and submitted for a decision on the briefs.

2

woke up around 9:00 a.m., the door was cracked, Amari was gone, and Hall left the room to try to find Amari but could not. Owens said that she had been with her sister all night and came back to the room around 5:00 a.m., pushed the door open because she did not have a key, could not see whether Amari was in the dark room at the time, and went to sleep before Hall woke her up later, telling her Amari was missing. Responding officers reviewed surveillance footage from the hotel and did not see Amari leaving the room that night, nor did they see Hall and Owens entering or exiting the room at the times they had indicated in speaking with the officers.

Police officers asked if Hall and Owens would accompany them to police headquarters to be interviewed, and they agreed, bringing the children along. Once there, Owens gave a video-recorded interview that was played for the jury at trial. During Owens's interview, investigators checked with her sister, who said Owens did not visit her the night before and that she had not seen Owens for months; Owens's sister testified to the same at trial. While Owens and Hall were being separately interviewed, police observed that the other two children, who were five and six years old, had visible injuries, including bruises, welts, scars, and cuts all over their bodies. Police photographed the children's injuries at that time, and those photos were later published to the jury during Owens's trial. The children also appeared malnourished, were hungry, and consumed an entire large pizza that officers ordered for them. A deprivation order was signed at 10:30 p.m., and the two children went into the custody of the Department of Family and Children Services. Owens and Hall were arrested, and search warrants were executed on their cell phones.

Videos were discovered on Owens's cell phone from about three months prior, showing several instances of Owens and Hall

3

physically abusing all three children. Owens's face and distinctive large koi fish tattoo on her left arm are visible in several of the videos, which show her physically abusing the children, including hitting and stomping on them. Other videos appear to show the same person, identifiable from her build, clothing (which is the same as the clothing worn by Owens in some of the other videos), and voice, abusing the children. Additional videos clearly show Hall, who had distinctive leg tattoos, abusing the children, and a voice similar to Owens's can be heard speaking to Hall.

Investigators also found on Owens's cell phone Google searches from November 19 for "What to do when a child just won't listen," "lakes near me," "How the sewers on the streets work[]," "Why do kids run away?" and "How do I report someone missing?" All these searches had been deleted. By investigating the cell phone, business and financial records, surveillance videos, and Flock cameras, law enforcement officers also discovered that Owens rented a U-Haul on the afternoon of November 19; bought bleach and latex gloves from a convenience store; backed the U-Haul into a spot near her hotel room that afternoon and left about an hour later; turned off location services on her phone just before leaving; drove eastbound on Jimmy Carter Boulevard toward DeKalb County; used her phone's flashlight at 6:55 p.m.; called Hall three minutes later; turned location services back on about 30 minutes later; and returned the U-Haul at 7:36 p.m.

Amari's sister, who was nine years old at the time of trial, testified that she and her siblings only ate bread when they lived with Owens and Hall. They all got spanked, did not have toys but instead "looked at the wall," and slept on the floor. When asked about the last time she saw Amari, she said, "my brother and sister didn't get to eat no real food. And then my sister went into the bathroom and when she came out, [Hall] told her to open her

4

mouth. And she had toilet paper in her mouth and the next morning she wouldn't wake up," and "got put in a container with a lid on it" by Owens "and got put in a trunk of a car and drove to the bad kids hospital," a place Owens talked about "a lot."

Hall eventually told investigators the location where Amari's body could be found, and on November 23, they found Amari's body where Hall said it would be, a dumpsite by a wood line in DeKalb County. Amari's body was wrapped in trash bags. The medical examiner who performed Amari's autopsy determined that her death was caused by multiple blunt-force injuries in multiple stages of healing, with malnourishment being a complicating factor. Amari's bodyweight fell in the bottom fifth percentile for girls her age. She had linear marks on her ankles and legs consistent with binding; a significant blunt-force injury to her chest that bruised her right lung and tore her liver; a cross-hatch area on her abdomen, possibly from footwear, that "crushed her liver against her spine," indicating she was stomped; a bruised pancreas; fractured ribs; and various other bruises and abrasions on her body, including her head and vagina. The medical examiner opined that Amari died from the culmination of all her injuries because each injury was physiologically relevant to her death, which was ruled a homicide.

2.      Owens contends that this evidence was constitutionally insufficient to support her convictions for malice murder, felony murder, aggravated battery, aggravated assault, and cruelty to children in the first degree.[2] Specifically, as for the malice murder count, she argues that the evidence showed at most that she

---

[2] Owens specifies that she does not challenge her convictions for concealing the death of another and making a false statement to police. And Owens's challenge to the sufficiency of the evidence to support the felony murder

acted as an accessory after the fact because evidence of her actions and knowledge after the commission of the other crimes is insufficient to show that she acted as a party to those crimes under OCGA § 16-2-20, and there was no evidence that she participated in any criminal scheme either before or during Amari's death. With respect to the child-cruelty convictions, Owens argues that the videos found on her cell phone did not positively identify her as the abuser of the children. This claim fails.

When we review the sufficiency of the evidence as a matter of constitutional due process, we view the evidence in the light most favorable to the jury's verdict to determine whether a rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 US 307, 319 (1979). On appeal, "this Court does not reweigh the evidence or resolve conflicting testimony." *Mosby v. State*, 300 Ga. 450, 452 (2017).

Turning to the malice murder conviction, "[a] person commits the offense of murder when [s]he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1(a). See also OCGA § 16-2-20(b) ("A person is concerned in the commission of a crime only if [s]he: … [d]irectly commits the crime; … [i]ntentionally aids or abets in the commission of the crime; or … [i]ntentionally advises, encourages, hires, counsels, or procures another to commit the crime."); *Debelbot v. State*, 305 Ga. 534, 538 (2025) ("Whether a person is a party to a crime may be inferred from that person's presence, companionship, and conduct before, during, and after

counts and their predicate felonies (Counts 2–7) is moot because those counts were merged or vacated by operation of law. See *Schell v. State*, 310 Ga. 567, 571 n.3 (2020). So we will only address the sufficiency of the evidence for her malice murder and child-cruelty convictions.

6

the crime, and where the crimes involve relatives with close relationships, slight circumstances can support the inference that the parties colluded." (citations and punctuation omitted)).

Here, the jury was presented with overwhelming evidence that Owens did much more than cover up the murder and that she either maliciously killed Amari herself or did so as a party to the crime with Hall. That evidence included that Owens and Hall, who were in a long-term coparenting relationship of over a decade, were Amari and her siblings' sole caretakers at the time Amari died as the result of beatings; Owens lied to police that she was with her sister the night that Amari disappeared; videos discovered on Owens's cell phone taken before Amari's death showed Owens and Hall abusing and stomping on the children; Amari's injuries were indicative of stomping and the other forms of abuse shown in the videos; and incriminating searches from November 19 were discovered on Owens's cell phone. In addition, there was damning evidence of Owens's conduct after Amari's killing – including Amari's sister's testimony that after Amari would not wake up, Owens put Amari in a container with a lid and said she was taking Amari to "the bad kids hospital," and the extensive evidence showing that Owens rented a U-Haul and turned location services off on her phone to travel toward the area where Amari's body was later found after Hall directed investigators to that location.

This evidence, taken together and viewed in the light most favorable to the jury's verdict, was constitutionally sufficient for a rational jury to conclude beyond a reasonable doubt that Owens was guilty of the malice murder of Amari, either as the direct perpetrator or as a party to the crimes. See, e.g., *Payne v. State*, 318 Ga. 249, 253 (2024) ("Because there was trial evidence showing that Appellant and Boyd were Journey's only caretakers during

7

the period when Journey sustained the fatal injuries and that those injuries were caused by non-accidental, direct force, the jury was authorized to conclude that either Appellant or Boyd or both were responsible for Journey's injuries and death."); *Bates v. State*, 317 Ga. 809, 816 (2023) (noting that defendant's lie to police about what he was doing when the crimes occurred allowed the jury to "infer that he was trying to hide his own participation" in a murder); *Battle v. State*, 305 Ga. 268, 271 (2019) (evidence that defendant had "sometimes" hit the child-victim, "allowed and encouraged" her co-defendant to whip the victim, and was present on the night of the victim's death was sufficient for a rational jury to find beyond a reasonable doubt that defendant was guilty at least as a party to the crimes of malice murder and first-degree cruelty to children); *Delacruz v. State*, 280 Ga. 392, 393, 396 (2006) (holding that evidence which included that child's injuries were "compatible with child abuse … in various stages of healing" and that the child's father "regularly beat the child," authorized the jury "to conclude beyond a reasonable doubt that [the father] participated in [a] pattern of child cruelty over the course of several months, and that he aided and abetted in the malicious acts that caused [her] death").

As for Owens's child-cruelty convictions, which were based on the videos of other abuse found on Owens's cell phone, a review of the videos shows that Owens's face and distinctive koi fish tattoo on her left arm are visible in some of the videos, which showed her physically abusing the children, and other videos appear to show the same person also abusing the children. Other videos clearly show Hall perpetrating the abuse, and a voice similar to Owens's can be heard speaking to Hall. Also, Amari's sister testified about the abusive treatment she and her siblings received while in the care of Owens and Hall, which was further corrobo-

8

rated by the injuries observed and photographed by law enforcement officers. Viewed in the light most favorable to the jury's verdict, the evidence was constitutionally sufficient for a rational jury to conclude beyond a reasonable doubt that Owens was guilty of each count of child-cruelty, either as the direct perpetrator or as a party to the crimes.  See OCGA § 16-5-70(b) ("Any person commits the offense of cruelty to children in the first degree when such person maliciously causes a child under the age of 18 cruel or excessive physical or mental pain.").  See, e.g., *Battle*, 305 Ga. at 271; *Delacruz*, 280 Ga. at 393, 396.  Accordingly, Owens's claim fails.

*Judgment affirmed. All the Justices concur.*

9